UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 09-6040-RSR

UNITED STATES OF AMERICA,

              Plaintiff,

v.

CINDY MORAN and
JOSE SANCHEZ,

              Defendants.

_____/

### AMENDED DETENTION ORDER[1]

Pursuant to 18 U.S.C. § 3142(f), on February 13, 2009, a hearing was held to determine whether Defendants Cindy Moran and Jose Sanchez should be detained prior to trial.  Having considered the factors enumerated in 18 U.S.C. § 3142(g), this Court finds that no condition or combination of conditions will reasonably ensure the appearance of Defendants.  Therefore, it is hereby **ORDERED** that Defendants Cindy Moran and Jose Sanchez be detained prior to trial and until the conclusion thereof.

In accordance with the provisions of 18 U.S.C. § 3142(i), the Court hereby makes the following findings of fact and statement of reasons for the detention:

---

[1]This Detention Order is amended from the original Detention Order issued on February 17, 2009, in that it corrects the facts as they relate to the presence of Juan Baez at the airport on February 5, 2009.  *See infra* at pp. 5-6.  Based on the Government's Motion to Correct Scrivener's Error in Detention Order [D.E. 20], it appears that the Court misunderstood the facts as they relate to Baez's presence at the airport on February 5, 2009.  In light of this misunderstanding, the Court has considered anew the Government's motion for pretrial detention and Defendants' opposition thereto.  The Court finds that the reasoning behind the original Detention Order stands, even in light of the corrected facts.

1.  Defendants are charged by complaint with conspiracy to possess with intent to distribute at least one kilogram of heroin, in violation of 21 U.S.C. §§846, 841(a)(1), and 841(b)(1)(A); attempt to possess with the intent to distribute at least one kilogram of heroin, in violation of 21 U.S.C. §§846, 841(a)(1), and 841(b)(1)(A); and being public officials who sought, received, accepted, and agreed to accept an item of value in return for being induced to do an act in violation of official duty, in violation of 18 U.S.C. §201(b)(2)(C).  Based upon these charges, a rebuttable presumption exists that Defendants pose a risk of flight and danger to the community if released.  18 U.S.C. §3142(e) and (f).

2.  Title 18, United States Code, Section 3142(g)(2), requires the Court to consider the weight of the evidence against the defendants.  Here, the weight of the evidence is substantial.  The government has provided sworn testimony that supports the allegations in the complaint.  Specifically, the government presented a proffer which was sworn to by Department of Homeland Security ("DHS") Office of Inspector General ("OIG") Special Agent Shane Glassing.

By adoption, Agent Glassing testified that on July 31, 2008, a federal grand jury charged Juan Baez with passport fraud and illegal entry.  Baez had been deported in 2004 from the United States to the Dominican Republic after conviction on drug charges in Massachusetts.

On January 29, 2009, Baez was arrested in New York on the warrant stemming from the July 31st indictment.  At the time of his arrest, Baez described an illegal drug-smuggling operation that he claimed to have participated in with Defendants.  According to Agent Glassing's adoption of the Government's statement of the evidence, Baez paid Defendants Moran and Sanchez, an inspector with Customs and Border Protection and a supervisor with the Transportation Safety Administration, respectively, to assist him and others in importing cocaine and heroin into the United States from

the Dominican Republic and facilitating the transportation of such drugs between South Florida and New York upon their arrival in the country.

Baez explained that approximately three years ago, he met with Defendants and Defendant Moran's sister, Elizabeth Moran, in the Dominican Republic, where they discussed the plan. As Baez explained the alleged scheme to law enforcement, Baez recruited couriers, mostly from New York, to bring the drugs into the United States from the Dominican Republic. Once the drugs arrived in the United States, Defendant Moran and her sister Elizabeth used their contacts to get the drugs through Customs successfully. After the drugs were in the United States, Baez stated, Defendant Sanchez facilitated their air transportation domestically. As Baez summarized the operation, the alleged conspiracy had attempted to make drug shipments approximately fifteen times. Of those fifteen attempts, ten were successful. On five occasions, however, couriers were caught while attempting to deliver drugs. More specifically, the Government proffered that in April, 2007, a courier from the organization was caught with 37.8 pounds of cocaine; in October, 2007, a courier was arrested with 83.65 pounds of cocaine; in March, 2008, a courier was found with 7 pounds of heroin; in September, 2008, a courier attempted unsuccessfully to transport a pound of heroin; and in November, 2008, a courier was caught with cocaine.

Baez further advised law enforcement that for each kilogram of cocaine successfully brought into the United States and transported to New York, he paid Defendants $4,500.00, and he paid them $6,000 for each such kilogram of heroin. According to Baez, Defendant Moran provided Baez with instructions regarding whom to pay the money. Citing to prior deliveries, Baez explained that on one occasion, for example, where 23 kilograms of cocaine and 7 kilograms of heroin were successfully transported, he paid $122,000 to Defendant Moran's mother at Defendant Moran's

direction.  Similarly, on another occasion, Baez asserted, Defendant Moran instructed Baez to make payment of $45,000 at Defendant Moran's parents' home in New York, in payment for the facilitation of transportation of 10 kilograms of cocaine.

At the time of his arrest, Baez had been using the alias, "Anibal Acosta."  TECHS records reflect that in July, 2006, Defendant Moran's sister Elizabeth accessed TECHS to check the name "Anibal Acosta."  According to the Government, she did this to ensure that the name was "clean," so Baez would not be stopped for reasons related to that name if he traveled to the United States under that name.  Two months later, in September, 2006, Customs records indicate, someone entered the United States using the name "Anibal Acosta."  Baez told law enforcement authorities that he was the one who entered, and he stated that Defendant Moran was present when he passed through Customs.  Shortly thereafter, Baez obtained a Florida identification card in the name of "Anibal Acosta."  The address listed for "Acosta" on the identification card was that of Defendants Moran and Sanchez.  Baez explained to law enforcement that he was staying at Defendants' home at that time.

After this debriefing of Baez, law enforcement flew Baez to South Florida to direct him in an investigation of Defendants.  During the course of this investigation, Baez indicated to Defendants that he needed to move a load of heroin from South Florida to New York.  For the purpose of furthering the plan to move the heroin, on February 4, 2009, Baez met with Defendants at their residence in Cooper City.  At this time, he was wearing a transmitter that allowed monitoring agents to hear and record his conversations.  During the meeting, Baez referred to the fee that he would owe Defendants upon successful transportation of the drugs, since the operation would require only the domestic transportation, as opposed to the international and domestic transportation.  In this regard,

-4-

Baez stated that he knew the fee was $1,200 for "coke," but he was unsure of the charge for "dope." According to Baez, by "dope," all parties understood that Baez meant heroin. Also during the conversation, Baez asked where to meet Sanchez the following day to facilitate the transportation of the drugs. Defendant Sanchez instructed him in words to the effect that Baez should meet Defendant Sanchez at the same terminal as always for the 6 a.m. U.S. Airways flight. Baez then claimed not to recall which terminal that was, and Defendant Sanchez responded that it was Terminal 3, stating words to the effect that it was the one they had "used before."

The following day, on February 5, 2009, Baez, accompanied by an undercover law enforcement agent acting as a courier for the heroin, went to the security checkpoint at Terminal 3. The undercover agent was carrying a suitcase containing approximately 10 kilograms of purported heroin, among some clothing items. According to the Government, the heroin took up about 80% of the space in the suitcase. Law enforcement observed Defendant Sanchez, while on duty as a TSA supervisor, meet Baez and the undercover agent near the Terminal 3 security checkpoint. At that time, Defendant Sanchez took the suitcase containing the purported heroin from the agent and placed it on the x-ray conveyor belt. Defendant Sanchez then stood behind the screener. After the suitcase went through the x-ray machine, Defendant Sanchez picked the bag up from the conveyor belt and returned it to the agent. Baez left the airport and remained in South Florida.

As the undercover agent proceeded to the gate to meet his flight, Defendant Sanchez followed behind. On that particular day, TSA had decided to conduct gate screening at the gate of the agent's flight to New York. Consequently, two TSA employees were screening passengers as they boarded the flight. Defendant Sanchez, who, according to TSA policy, is not permitted to leave the original security screening area unless there is an emergency requiring his attention, went to the

-5-

gate and spoke with the TSA employees there before the agent attempted to board.  The TSA employees allowed the agent to board without any additional screening.  Consequently, he boarded and flew to New York.

After the agent's flight landed, Baez contacted Defendant Moran to arrange for the delivery of the $25,000 fee for Defendants Moran and Sanchez.  Wearing a transmitter that allowed for monitoring and recording, Baez proceeded to Defendants' residence, where he met outside with Defendant Moran and her sister Elizabeth.  Baez showed the $25,000, along with another $5,000 that Baez described as his cut for the load, to Defendant Moran and her sister.  The three then went into the house, where Defendant Sanchez was sleeping on the couch.  He woke briefly.  Then Baez gave the bag to Defendant Moran and left the house.

Shortly thereafter, Defendant Sanchez left his house and drove to Publix, where he was arrested.  Defendant Moran similarly left the house, and she was also arrested.  Law enforcement froze the scene and obtained a search warrant for the residence.  Upon executing the search, law enforcement recovered the DHS funds just provided by Baez to Defendants.  Among the places where the money was found, law enforcement found $5,000 in a box, $3,000 in a separate box, and another $1,500 in yet another box.  Along with the $1,500, law enforcement found approximately $28,000 in non-DHS funds, as well as another $6,000 in cash in the master bedroom.  In addition to the money, law enforcement located documents identifying Defendants' financial accounts.  While law enforcement is in the process of obtaining and analyzing the complete records for Defendants' financial accounts, law enforcement stated that the records examined at this point show significant unexplained deposits and withdrawals from Defendants' financial accounts.

In response to the Government's evidentiary presentation, Defendant Sanchez pointed out

that as an eleven-year member of the Army Reserves, he was on active duty in Kuwait during the April and October, 2007, events wherein a courier was caught attempting to bring illegal narcotics into the United States.  Despite this fact, based on the testimony – even considering the February 5th transaction alone, the Court finds the evidence against both Defendants to be substantial.

3.  The pertinent history and characteristics of each Defendant, of which Sections 3142(g)(3)(A) and (B) require a review, include the following:

Defendant Moran is a United States citizen.  She grew up in New York but has lived in the Southern District of Florida for the past four years.  Here, she lives with her husband, Defendant Sanchez, and her two children from prior relationships, in a house in the midst of foreclosure proceedings.  The children's fathers pay child support.  Defendant Moran's parents reside in New York, and her only sibling, Elizabeth Moran, discussed above, lives in Miramar, Florida. Approximately three years ago, Defendant Moran went to Ecuador, where some of her extended family lives, for her niece's wedding.   Also around that time, Defendant Moran visited the Dominican Republic with Defendant Sanchez, where Defendant Sanchez has some family. Defendant Moran has no criminal history.

At the detention hearing, Defendant Moran's parents attended to show their support and willingness to co-sign a bond.  Additionally, Defendant Moran's grandparents were willing to co-sign a bond.  Defendant Moran requested the imposition of a high personal surety bond to be co-signed by her parents, Santiago Aloha, and Defendant Moran, and a 10% bond not to exceed $75,000.

Defendant Sanchez, like Defendant Moran, is a United States citizen.  He also grew up in New York, but moved to the Southern District of Florida nine years ago.  Although Defendant

Sanchez has three children, none of them live with him.  An eighteen-year-old daughter resides in New Jersey, a six-year old daughter lives in Hollywood, Florida, with her mother, and a five-year-old son lives in Coral Springs with his mother.  Although Defendant Sanchez pays child support for the two younger children, he has no contact with his son.  Defendant Sanchez's mother and stepfather, Milda and Francisco Pena Sr., by whom Defendant Sanchez was raised, live in Lauderhill, Florida. Defendant Sanchez's brother Francisco Pena Jr. similarly lives in the Southern District of Florida, and Defendant Sanchez's sister resides in New York.  As with Defendant Moran, Defendant Sanchez traveled to Ecuador approximately three years ago to visit Defendant Moran's extended family.  He also vacationed in the Dominican Republic about three years ago, where he visited his family.

Defendant Sanchez has served for more than eleven years in the Army Reserves.  He recently was called for and served active duty in Kuwait.  Specifically, Defendant Sanchez was serving in Kuwait from March, 2007, through June, 2008, a period of time that includes two of the intercepted shipments attributed by Baez to the drug-trafficking conspiracy of which Defendant Sanchez is alleged to be a part.

Defendant Sanchez requested a $100,000 personal surety bond to be co-signed by Defendant Sanchez, his parents, and his brother.  Additionally, Defendant Sanchez advised that his family is willing to deposit $3,000 in cash into the registry of the Court.  Defendant Sanchez further offered that his parents would agree not to encumber their $50,000 home in Lauderhill, and Defendant Sanchez would agree not to encumber his two properties worth $10,000 each.  Defendant Sanchez further suggests electronic monitoring.

4.  If convicted, Defendants face a minimum mandatory sentence of ten years' imprisonment, with a possible maximum term of imprisonment of life.  Moreover, based solely on the 10 kilograms

of purported heroin involved in the February 5th transaction, and taking into account an adjustment for abuse of their positions, if convicted Defendants face a Sentencing Guidelines range of 235 to 293 months' imprisonment. The Court finds that Defendants have not rebutted the presumption with respect to risk of flight.

First, both Defendants have family ties outside the United States. Although the Court recognizes that neither has previously resided outside the United States, these family ties are, nonetheless, significant, in light of other circumstances in this case. First, large amounts of money are currently unaccounted for. Second, Defendants face substantial sentences if convicted. Third, the alleged conspiracy involved the use of a false identity by Baez. According to the allegations, Baez was able to succeed in the use of that false identity because of the assistance of Defendant Moran and her sister. Third, the scope of the alleged conspiracy is international in nature, with the origins of the conspiracy allegedly traced back to a meeting in the Dominican Republic, and the couriers alleged to be a part of the scheme also entering the United States from foreign countries.

Fourth, Defendants' ties to the Southern District of Florida, while not insignificant, are not so strong as to provide the Court with reasonable assurance that Defendants will appear as required. In Defendant Moran's case, her sister is alleged to be involved in the conspiracy, and her parents allegedly received proceeds from the drug-trafficking operation on Defendants' behalf. As well intentioned as Defendant Moran's relatives may be in offering to assist with bond, their alleged involvement in the scheme makes these relatives less than ideal candidates to co-sign a bond or to incur some responsibility for Defendants' appearances as required. Moreover, as noted above, both Defendants have ties to foreign countries. And, Defendants' home here is in foreclosure. As for Defendant Sanchez, while the Court appreciates the relatives' generous offers to assist Defendants

Sanchez and Moran with their bonds, the Court finds that the amounts of the bonds requested by Defendants are simply not enough to reasonably ensure their appearances under the circumstances articulated above, even in view of the request for electronic monitoring. Nor can the Court conceive of bond conditions and a reasonable bond attainable by these Defendants, which provide reasonable assurance that Defendants will appear as required. Consequently, the Court specifically finds by a preponderance of the evidence (as well as clear and convincing evidence) that Defendants are a serious risk of flight for which no condition or combination of conditions will reasonably ensure their appearances as required.

5. With respect to danger, the Court reaches the opposite conclusion. Although Section 3142(e) imposes a rebuttable presumption of danger where, as here, Defendants face drug-trafficking charges with a maximum term of imprisonment of at least ten years, the Court finds that conditions could be fashioned in this case to address the danger. The charges against Defendants are serious and, if proved, involve an extensive drug-trafficking operation international in scope. Nevertheless, while it may not be unreasonable to assume that guns were carried or used at some point during the distribution of the narcotics in the alleged scheme, no such evidence was presented at the hearing. Nor did any of the allegations include any claims of violence or threats.

Although the potential danger to the public caused by Defendants' alleged willingness to allow people into this country who were not authorized to be here and to do so under false names, as well as their alleged willingness to permit baggage to proceed onto airplanes without subjecting it to searches, cannot be understated, the Court can fashion conditions to address this danger. Most notably, Defendants could be precluded from any contact with any witnesses or co-conspirators to the alleged crime and anyone who works at the airport. They could similarly be prohibited from

going to any airports and could be placed on home detention.  The Court finds that here, where the

sole motive attributed to Defendants consists of their alleged desire to make money, such conditions

could reasonably ensure the safety of the community and others.

     6.  Accordingly, the Court hereby directs:

     (a)  That Defendants be detained without bond and be committed to the custody of

the Attorney General for confinement in a corrections facility separate, to the extent practical, from

persons awaiting or serving sentences or being held in custody pending appeal;

     (b)  That Defendants be afforded reasonable opportunity for private consultation with

counsel; and

     (c)  That, on order of a court of the United States or on request of an attorney for the

Government, the person in charge of the corrections facility in which Defendants are confined

deliver Defendants to a United States Marshal for the purpose of an appearance in

connection with a court proceeding.

     **DONE AND ORDERED** at Fort Lauderdale, Florida, this 19th day of February, 2009.


                    ROBIN S. ROSENBAUM
                    United States Magistrate Judge

Copies to:

Counsel of Record
Pretrial Services (FTL)